UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
UNITED STATES OF AMERICA,           :
                                    :
              -v-                   :        21-cr-88-3(JSR)
                                    :
CELVIN FREEMAN,                     :        MEMORANDUM ORDER
                                    :
              Defendant.            :
------------------------------------ x
JED S. RAKOFF, U.S.D.J.

    Celvin Freeman and his three co-defendants were indicted for conspiracy to commit wire fraud, wire fraud, conspiring to commit money laundering, conspiracy to receive stolen money, and receipt of stolen money. ECF No. 2. Now before the Court is Mr. Freeman's motion to suppress statements he made during a post-arrest interview with FBI and other agents on the grounds that his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel were violated. ECF No. 37. The Government opposes. See ECF No. 38. For the reasons set forth below, the Court, although taking note of some seemingly dubious practices on the part of the law enforcement agents here involved, denies the motion.

## FACTUAL BACKGROUND

    The facts here pertinent are either undisputed or, where disputed, are taken most favorably to Freeman.

Freeman is from Ghana and English is his second language, Freeman Decl. ECF No. 36-2 at 1, though he has lived in the U.S. since 2010. ECF No. 38 at 2.[1] He had never been arrested before and has no particular familiarity with the U.S. justice system. Freeman Decl. ECF No. 36-2 at 1.

Freeman was arrested in the early morning of February 17, 2021 based on the indictment filed in this case. ECF No. 36 at 1. At approximately 9:00 a.m., Freeman was taken to a room in the FBI offices to be interviewed. Id. at 1-2. His right hand was handcuffed to a wall bar. Id. The interview was videotaped and the video lasted just over an hour. See Video.[2]

The video recording starts with FBI Special Agents Scott Chan and Amanda Williams speaking with Mr. Freeman about his business in China and when Freeman travelled there, Video at 9:01:01 - 9:03:53. This is before the agents read Mr. Freeman any Miranda warnings. However, after Secret Service Special Agent Caitlin Robson and DOJ OIG Special Agent Anya Whitney

---

[1]    The Government points out that English is the official language of Ghana and that Freeman has not requested an interpreter for any court appearance. ECF No. 38 at 2.

[2]    Quotations and citations referred to as "Video" are, unless otherwise noted, timestamp references to the videotaped recording of the interview. ECF No. 38, Ex. A.

enter the room, Video at 9:04:03, <u>Miranda</u> warnings are read twice.

Before Agent Chan reads the first set of <u>Miranda</u> warnings from an FBI form, Agent Williams says, "we're here to talk about some things," and then "there are a couple of admin things first here." Video at 9:05:55. As Agent Chan reads the <u>Miranda</u> warnings on the first form to Freeman, he points to each line of the form as he reads it, while Freeman looks on and periodically nods. Video at 9:06:06 – 9:06:56. After reading to Mr. Freeman "You have the right to remain silent," Agent Chan interjects, saying "This is everything you've seen on TV, okay?" Video at 9:06:25. Agent Chan then continues reading the form, but he does not read the last line on the form, just above Freeman's signature, which states "At this time, I am willing to answer questions without a lawyer present." Ex. B, ECF No. 38 at 26. Instead, Agent Chan asks Freeman, "Do you understand all this?" Video at 9:06:57. Freeman replies "Yes, I understand." Video at 9:06:58. Chan adds "Can we get you to sign this just to say you understand that I went over this with you?" Video at 9:07:00. Freeman then signs the FBI waiver. Video at 9:07:13.

However, Agent Chan then reads another version of the <u>Miranda</u> warnings -- this time, the Secret Service version, using a form that uses the word "waive" to a defendant's agreement to

give up his various rights. Video at 9:07:45 – 9:08:20; Ex. B, ECF No. 38 at 28; Ex. C, ECF No. 38. Chan then asks Freeman if he understands his rights, and if he is willing to talk to them and "waive" these rights; if so, then he should sign. Video at 9:08:22. But Freeman responds by asking what "waiving" means. Video at 9:08:42.

Although it would have been easy for the agents to say that "waiving" a right means to give up a right, they failed to do so. Instead, they ask Freeman if he wants to talk to them right now and restate that they are going to ask him some questions. Then the agents talk about how in the hundreds of interviews they have done, the best thing for someone in Freeman's position is to be honest because the first person who starts cooperating generally gets the best deal. Video at 9:08:43 – 9:09:38.

Freeman interrupts, saying "I don't have any lawyer present. I don't know." Video at 9:09:40. Agent Chan responds: "It's up to you, right. That's why we're reading you these rights so you understand what's going on. We could start talking to you. If you're not comfortable, then you can ask for a lawyer and you can say, 'I don't want to talk.' It's up to you, right? I'm not forcing your hand." Video at 9:09:43 – 9:10:00. Freeman repeats that " I'm not saying that you're forcing my hand but do – because for now, there's no lawyer to represent me. But there

4

is somebody that I know.[3] I don't know whether I can talk to him? I don't know." Video at 9:10:06.

Agent Williams interrupts to say, "We're not people who offer legal advice," but that as Agent Chan said, the more honest Freeman is initially, the better the outcome usually is, even though, she adds the agents cannot make any promises. Video at 9:10:20. Agent Williams then observes to Freeman: "You were already running this morning which I know, we mentioned earlier, doesn't look good. It's not going to look good to the judge." Video at 9:10:37. There's some more back and forth, after which Agent Williams says, "think about that and realize you have to be advocating for yourself here. You can't think of anybody else trying to protect anybody else. This is all about you talking to us. That's it. It's a conversation with us today." Video at 9:10:50. After this, Freeman signs the second waiver. Video at 9:11:06. Agent Chan then adds, "Like I said, if you're not comfortable at any time, you just tell us." Video at 9:11:20.

The interview continues for about an hour. Video at 9:11:20 – 10:05:15. The agents talk to Freeman about Freeman Auto and its bank accounts, which were allegedly used to launder fraud

---

[3]     Subsequent conversation, discussed below, indicates that this is a reference to a lawyer later identified as "Mr. Thomas."

proceeds; that Freeman's accounts were frozen by one bank and closed by another because of the size of deposits; that Freeman did not know and had never met the people who deposited money in his accounts, and that Freeman at some point learned the money he was receiving was not honest money.

At this point, after about an hour has passed, the FBI agents ask Freeman why he is protecting his co-conspirators and advise that he should "start talking." Video at 10:05:18 – 10:05:40. Freeman pauses for about 40 seconds and then says, "Is it possible I could talk to Mr. Thomas, please?" Video at 10:05:41 – 10:06:22. Agent Williams asks who Mr. Thomas is. Video at 10:06:33. Freeman says Mr. Thomas is a lawyer he knows, and asks again, "Is it possible I could talk to him?" Video at 10:06:35. Agent Williams then says to Freeman, "If that's what you want." Freeman says, again, "Is it possible I could talk to him?" Video at 10:06:38. Agent Williams replies, "If that's what you want. We can't make that choice for you. We're not going to say yes or no, you can or cannot talk. You have to say that you want to talk to him or not." Video at 10:06:43. Freeman responds, "Yes, can I talk to him," Video at 10:06:53, at which point Agent Chan replies, "Sure." Agent Williams adds, "When you do talk to Mr. Thomas, I would highly encourage that you talk to him about cooperating with the FBI, Secret Service, and OIG."

Video at 10:07:00. The agents help Freeman place a call to Mr. Thomas and the videotape ends.

## ANALYSIS

Mr. Freeman argues that the post-arrest interview violated his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel. The Court considers each in turn:

### I.   Fifth Amendment Right Against Self-Incrimination

The famous "Miranda" line of cases apply in cases of custodial interrogation, and neither party disputes that this was a custodial interrogation: Freeman had been arrested and was at the FBI offices, handcuffed to a wall bar by his right hand.

With respect to the Fifth Amendment, the prosecution may not use a suspect's statements made during a custodial interrogation unless the suspect "(1) has been apprised of his Fifth Amendment rights, and (2) knowingly, intelligently, and voluntarily waives those rights." United States v. Oehne, 698 F.3d 119, 122, 123 (2d Cir. 2012) (citing Miranda v. Arizona, 384 U.S. 436, 444-45 (1966)). The Government bears the burden of establishing by a preponderance of the evidence that a defendant waived his Miranda rights and that any subsequent

statements were voluntary. <u>United States v. Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991).

To show the defendant waived his <u>Miranda</u> rights, the Government must show that relinquishing the rights was (1) done knowingly, "which is to say that the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it"; and (2) was voluntary, "which is to say that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>United States v. Plugh</u>, 648 F.3d 118, 127-28 (2d Cir. 2011) (internal quotations omitted). Courts consider the totality of the circumstances when determining if a waiver was voluntary, knowing, and intelligent, including the characteristics of the accused, the conditions of the interview, and the behavior of the law enforcement officials. <u>United States v. Conners</u>, 816 F. App'x 515, 518 (2d Cir. 2020) (citing <u>United States v. Haak</u>, 884 F.3d 400, 409 (2d Cir. 2018)).

While, as further described below, the agents' approach in this case left much to be desired, in the end this Court, considering the totality of the circumstances, concludes that Freeman's waiver of his right to remain silent was knowing, intelligent, and voluntary. He said he understood his rights, was told he could say "I don't want to talk" if he felt

uncomfortable, and never said any words that were close to "I don't want to talk." Even when Freeman (having already signed the first form) asked what the word "waive" meant on the second form, and did not get a straight answer from the agents, Mr. Freeman, who never indicated any other problem with understanding the forms, signed both forms at the very place where the forms indicated that he was agreeing to talk to the agents.

Freeman readily conversed with the officers in English; no interpretation was needed. Other than asking what the somewhat legalistic term "waiving" meant, Freeman never indicated the slightest problem in speaking or understanding English. See United States v. Olaniyi, 796 F. App'x 601, 604 (11th Cir. 2019) (affirming district court's refusal to suppress statements made to FBI agents when non-citizen and non-native English speaker was given Miranda warnings and had no apparent trouble in understanding or speaking English throughout course of interview). When Freeman was read the Miranda warnings the first time, Freeman flatly and unequivocally stated that he understood them and signed the form. The second time, Freeman, although asking what "waiving" meant, clearly understood the general purpose of the second form and signed the second form as well.

Indeed, the second form was not really necessary, since Freeman had already knowingly and voluntarily signed the first form; probably the second form was read only because an agent of the Secret Service (who used the second form) had joined the agents of the FBI (who used the first form in interrogating Freeman). But the result was that Freeman was read his <u>Miranda</u> warnings twice, and signed two agreements to go forward with the interview. Realistically, it seems obvious that Freeman understood his rights and agreed to forego them and go forward with the interview.

The Court is nonetheless disappointed that the agents did not act in a more punctilious manner. There is really no excuse, for example, for their failure to directly answer Freeman's question about what "waiving" meant. In this and other respects, further described below, their desire to convince Freeman to talk with them overrode their duty to make sure he knowingly, intelligently, and voluntarily agreed to do so. But the fact remains that the overall circumstances strongly indicate that his decision to forego his rights and speak with them was indeed knowing, intelligent, and voluntary. Accordingly, the Fifth Amendment prong of Freeman's motion must be denied.

## II.  Sixth Amendment Right to Counsel

The right to counsel analysis includes two distinct inquiries: whether Mr. Freeman invoked his right to counsel and whether any waiver was knowing and voluntary. As discussed below, Mr. Freeman did not unambiguously invoke his right to counsel at the beginning of the interview, though the agents recognized at the end of the interview that Mr. Freeman was, at that point, invoking his right to counsel, and accordingly ended the interview.

Invoking the right to counsel must be unambiguous. "If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." Davis v. United States, 512 U.S. 452, 459 (1994)(emphasis in original).

Several of Freeman's statements indicated he wanted to talk to an attorney, even though he twice signed a confirmation that he understood his right to counsel and was willing to speak with the agents anyway. Freeman said "I don't have any lawyer present. I don't know." The agents told Freeman "If you're not comfortable, then you can ask for a lawyer and you can say, 'I don't want to talk.'" Freeman replied "I'm not saying you're

11

forcing my hand but do — because for now there's no lawyer to represent me. But there is somebody that I know. I don't know whether I can talk to him? I don't know."

While it subsequently appeared that Freeman might have been referring to a lawyer named Mr. Thomas, Mr. Freeman did not make an unequivocal statement that he wanted a lawyer. The agents were thus not required to stop questioning him at that point or to further clarify with Mr. Freeman whether he wanted a lawyer. See Oehne, 698 F.3d at 123 ("'If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal . . . the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.'" (quoting Berghuis v. Thompkins, 560 U.S. 370, 381 (2010))).

As the court observed in Oehne, statements like "Maybe I should talk to a lawyer," or "Do you think I need a lawyer," or even saying "I'm going to get a lawyer," have been found insufficient to constitute an unambiguous request for counsel. 698 F.3d at 123. Mr. Freeman's statements were the kind of equivocal or ambiguous statements that do not require the agents to stop questioning him, especially given that, after Mr. Freeman made the above-quoted statements, he then went on to sign the second Miranda waiver form. Nor were the agents

required to further clarify whether Mr. Freeman wanted a lawyer or not. Mr. Freeman signed two waiver forms, spoke with the agents for about an hour, and then clearly expressed his desire to have a lawyer present, at which point the agents stopped questioning him and facilitated a call with a lawyer. Until the end of the interview, Mr. Freeman did not unambiguously invoke his right to counsel.

In any case, Mr. Freeman's waiver of his Miranda rights, as discussed above, is also sufficient to knowingly and voluntarily waive his right to counsel. Michigan v. Harvey, 494 U.S. 344, 348-49 (1990) ("For the fruits of postindictment interrogations to be admissible in a prosecution's case-in-chief, the State must prove a voluntary, knowing, and intelligent relinquishment of the Sixth Amendment right to counsel . . . . We have recently held that when a suspect waives his right to counsel after receiving warnings equivalent to those prescribed by Miranda, . . . that will generally suffice to establish a knowing and intelligent waiver of the Sixth Amendment right to counsel for purposes of postindictment questioning." (citing Patterson v. Illinois, 487 U.S. 285, 292-93 (1988))). As discussed above with regard to the waiver of Mr. Freeman's right to remain silent, the Government established by a preponderance of the evidence that Mr. Freeman's waiver was knowing and

voluntary. This knowing and voluntary waiver of his Miranda rights was also sufficient to establish a waiver of his Sixth Amendment right to counsel.

Accordingly, the second prong of Mr. Freeman's motion to suppress must likewise be denied.

While Supreme Court precedent thus requires denial of Mr. Freeman's motion in its entirety, the Court reiterates that it is troubled by the agents' behavior in this case in several respects.

First, the agents' engaging in substantive conversation with Freeman after taking him into custody and bringing him to an interrogation room but before giving him his Miranda warnings is contrary to the spirit, if not the letter, of Miranda. The Government characterizes the agents' conversation with Freeman prior to reading him his Miranda rights as permissible "small talk." ECF No. 38 at 4. A review of the video, however, indicates the opposite, since some of what Agents Chan and Williams discussed with Freeman before giving him the Miranda warnings concerned Freeman's business in and travel to China, which was later a material subject of the post-warning interview. However, the Government states that it is not seeking to admit any statements Freeman made prior to being given the Miranda warnings, so no such statements are part of this

14

suppression motion. ECF No. 38 at 4 n.2. But this does not detract from the fact that it is clearly a bad practice.

Second, the Court is similarly troubled by the manner of the agents' delivery of the Miranda warnings to Mr. Freeman. Protecting the constitutional rights of the accused safeguards the bedrock principles of our justice system, and the Miranda warnings are anything but "admin things," as Agent Williams referred to them at the outset. Similarly, Agent Chan's interjection, partway through reading the warnings, that this "is everything you've seen on TV," also makes light of an essential and serious requirement to protect the rights of the accused. Such minimization is also true of Agent Chan's statement to Mr. Freeman after reading the first form, "Can we get you to sign this just to say that you understood that I went over this with you" (rather than saying that by signing you agree to forego your rights).

Third, as already noted, when Mr. Freeman asks, upon reviewing the second form, what "waiving" means, the agents could easily have answer that "it means you give up the rights we just talked about." Yet they did not provide that simple answer or anything remotely like it, but instead pivoted back to warning Mr. Freeman of the troubling situation he was in, a situation that would be improved -- though the agents were

making no promises -- if he talked with them. Once again, this may not have been contrary to the letter of Miranda, but it was plainly contrary to its spirit and purpose.

Nor were these the only respects in which the agents' language and approach left much to be desired. For example, Agent Williams' ambiguous comment to Mr. Freeman that "you have to be advocating for yourself here," while seemingly intended to encourage him not to cover up the misconduct of others, could have been misinterpreted as meaning that he did not need a lawyer.

In short, while the applicable law requires denial of the instant motion, the somewhat cavalier approach of the agents cannot be condoned.

## CONCLUSION

For the foregoing reasons, Freeman's motion to suppress is denied.

The Clerk is directed to close the entry bearing docket number 37.

SO ORDERED.

Dated:    New York, NY
          Aug 27, 2021

JED S. RAKOFF, U.S.D.J.

16